Filed 11/7/23  P. v. Stewart CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOVHON STEWART,<br><br>        Defendant and Appellant. | A160687<br><br>(San Mateo County<br>Super. Ct. No. 17-SF-009917-A) |

A jury found defendant Jovhon Stewart guilty of second degree murder, unlawful firearm activity, and dissuading a witness by force or threat.  He was sentenced to a determinate term of two years, eight months, and an indeterminate term of 40 years to life in prison.

Defendant now appeals.  He claims evidentiary and instructional error, prosecutorial misconduct, and ineffective assistance of counsel.  The parties agree that the abstract of judgment does not reflect the trial court's oral pronouncement on fines and fees, and the Attorney General further points out that a parole revocation fine must be imposed.

We will correct the sentencing errors and otherwise affirm the judgment.

1

# FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with the murder of Dejohn Jones (Pen. Code,[1] § 187, subd. (a)); count 1) with firearm enhancement allegations (§ 12022.53, subds. (b)–(d)), possession of a firearm within 10 years of being convicted of a misdemeanor offense (§ 29805; count 2), and dissuading a witness, B.F., by force or threat (§ 136.1, subd. (c)(1); count 3).

At trial, there was no dispute that defendant shot and killed Jones after Jones, along with his sister and cousin, showed up intoxicated at Jones's ex-girlfriend's apartment at 5:00 a.m. to retrieve some personal items. The prosecution's theory was defendant felt disrespected by Jones and the killing was premediated first degree murder. The defense argued defendant was liable for no more than manslaughter under one or both theories of imperfect self-defense and heat of passion.

*The Prosecution's Case*

The jury heard testimony from the following witnesses who were in the apartment when defendant killed Jones: Jones's ex-girlfriend Jolie H., Jolie's brother Victor B., Victor's friend Davinci M., Jolie's close friend and defendant's girlfriend B.F., Jolie's friend Kendra S., Jones's sister Venisha, and his cousin Monique M.[2] The prosecution also introduced statements to the police made by B.F., Victor, and Davinci.

Further prosecution evidence included defendant's police interview and jail calls between defendant and B.F.

---

[1] Undesignated statutory references are to the Penal Code.

[2] We refer to the witnesses by their first names in consideration of their personal privacy interests. (Cal. Rules of Court, rule 8.90(b)(4), (10).)

Jolie H.[3]

In August 2017, Jolie was living in an apartment in Belmont (the Belmont apartment). Her brother Victor lived with her, and Victor's friend Davinci was often there as well.[4]

Jolie had known Jones all her life, and they dated for about six months. Before she got her Belmont apartment, Jolie lived with Jones and his mother in Union City, and after she moved to Belmont, she "looked at it as our apartment."

Recently, however, Jolie had broken up with Jones, and on the morning of August 4, he texted Jolie that he was coming to get his things and he was a few minutes away. Jolie gathered the items, including a TV and sunglasses, and set them outside her apartment. She put the chain on the front door so she could see outside and sat in the living room with a bat. Jones did not come, so Jolie brought the items back inside.

That night, several people were with Jolie in her apartment, " 'just having a fun time, just chillin.' " Victor and Davinci were in the living room with B.F. and defendant. Jolie was in the bedroom with her new girlfriend and her friend Kendra.[5] People were drinking alcohol and smoking marijuana, and eventually everyone went to sleep.

At 5:00 the next morning, Jolie was awakened by B.F., who alerted her to knocking at the front door. Jolie heard "banging at the door, banging at

---

[3] The trial court declared Jolie unavailable as a witness, and her preliminary hearing testimony was read to the jury.

[4] Although Victor stayed at the apartment, Jolie was the only person on the lease. The apartment had one bedroom; Victor slept in the hall closet.

[5] Among those at the Belmont apartment that night, only Jolie and her girlfriend did not testify at trial.

3

the window," and yelling. Jones was yelling, " 'I know she's in there.' " Jolie realized Jones was with his sister and cousin.[6] Jolie told everyone not to open the door, and she went to get the TV in the bedroom. Then she saw Jones and his relatives in the hallway. Jones's sister Venisha said she wanted to talk to Jolie. Jones's cousin Monique asked for socks. Jones "was talking aggressive" and went into the bedroom to get the TV.

Jones took the TV to the front door, put it down, and walked back toward the bedroom. Jolie was by the kitchen, and defendant was next to her. Defendant said, " 'Do you want problems?' " Jolie grabbed defendant by his waist and said, " 'No fighting. Let him get his . . . stuff and leave.' " She did not hear Jones say anything. Defendant spun out of Jolie's hold and "went towards" Jones, and "it looked as if they were just tussling or . . ., like, wrestling, fight or something." Jolie went to the kitchen to get Monique, so they could try to stop the fighting. Jolie never saw any weapons. When she went to the kitchen, she heard a gunshot and then three more.

When the gunfire stopped, Jolie came out of the kitchen and saw Jones lying face down at her front door. Defendant was "nowhere in sight." Venisha started hitting Jolie.

Jolie never saw a weapon with anyone, and she did not see Jones "do anything that would have justified this killing." In the time she had known Jones, she never saw him with a firearm.

B.F.

*Trial Testimony*

In 2017, B.F. often visited Jolie. She was in an on and off dating relationship with defendant and sometimes took him to the Belmont apartment.

---

[6] Jolie had known Venisha and Monique all her life.

4

The day before the shooting, B.F. was hanging out with defendant when Jolie called and asked her to come over. During the call, Jolie mentioned that Jones had called and said he was going to have someone kick her door in and beat her up. Jolie "kind of seemed worried, but [also]. . . unbothered because I don't think she thought that he would actually follow through with it. But she did seem annoyed by it." B.F. did not tell defendant about Jones's threats to Jolie, and, as far as she knew, defendant was unaware of them.

B.F. testified she did not see defendant with a gun that evening, although she acknowledged she had seen him with a firearm in the days before the shooting, and there was a gun in the apartment that day.

The next morning, either Jolie or Victor opened the front door. Jones and his relatives "bogarted their way through the door." Venisha entered first and "was riled up already" and "threatening to break everything." She kicked over a dog gate separating the living room from the back of the apartment. B.F. testified that Jones and Monique "were calm. They just came to get whatever they came to get. They didn't really want no problems at first." Jolie was upset and "was trying to tell [Jones] not to just walk in her house like that," but he was not listening. B.F. tried to calm Jolie down in the kitchen. Jones walked straight to the bedroom and got the TV.

B.F. testified it became "hella chaotic." Jones and Victor "were exchanging a few words," and Venisha and defendant were arguing. Then Jones and defendant "exchang[ed] words" and "[i]t was kind of heated." Jones said, " 'I'll air this whole shit out,' " which B.F. understood to be a threat to shoot the place up. She did not remember what defendant said before Jones made that statement. Defendant said, " 'Do you want problems?' " after Jones threatened to shoot the place up. B.F. testified she

5

did not see defendant with a gun at this point, nor did he refer to having a gun.

B.F. heard "tussling" and "something go off." Then she heard two or three more gunshots and saw Jones "just laying there" close to the front door. She saw one gunshot hit Jones in his back.

B.F. was "not sure" who shot Jones. She acknowledged she was still in a relationship with defendant at the time of trial, she talked with him frequently, and she hoped to be reunited with him. She testified she had never been afraid of defendant.

The prosecutor then asked B.F. a series of questions about her interview with Belmont Police Detective Robert McGriff conducted two days after the shooting. She did not remember agreeing with McGriff that defendant could be violent.[7] She did not remember saying that defendant said, " 'Do you want problems?' " *first* and that Jones responded, "*Shoot if you want*, and I'll air this whole shit out." (Italics added.) She could not explain why she told McGriff that defendant ran to the back of the apartment toward Jones, and she denied he did that. The prosecutor asked why she told McGriff she thought defendant had a gun in his hands when he ran toward Jones. B.F. responded, "I don't recall seeing the gun."

B.F. remembered telling McGriff, " 'There's really—there's no reason [why Jones got shot]. How I see it, he came to get his stuff,' " and at trial, she agreed with her prior assessment. It appeared to her that Jones was trying to get away from defendant when he was shot. She recalled that McGriff asked whether one of the reasons Jones was shot was that defendant " 'was

---

[7] The prosecutor's questions regarding whether defendant could be violent and whether B.F. was afraid of defendant were relevant to count 3, dissuasion of witness B.F. by force or threat.

upset because [Jones] was pushing around Jolie when he came to the house,' " and she responded, " 'I don't think so.' " B.F. agreed she did not see anything suggesting defendant was upset by Jones's treatment of Jolie and acknowledged that she told McGriff, " 'When someone has a gun, they just feel invincible.' "

At the time of trial, B.F. was no longer in touch with Jolie, and defendant was the only person she was still in contact with among those present at the shooting.

*Police Interview*

After B.F. was excused, the prosecution called Detective McGriff, who confirmed he interviewed B.F. on August 7, 2017. He testified that she "was holding back quite a bit" initially, and she later indicated she was reluctant to share information "because she was afraid of [defendant]."

The prosecution then played B.F.'s videorecorded police interview. B.F. said she used to date defendant but it "wasn't nothing too serious though so, cause we kinda got rough," and they had a "[c]ouple physical altercations."

B.F. agreed with McGriff's suggestion that defendant was "pretty violent, . . . can be violent." McGriff next asked, "Is there something you're not telling, because you're worried about him hurting you?" She responded, "I mean, when people know where you live, it's kinda like, anything can happen, I don't wanna to be put in this situation, where my mom is in danger, or me and my child, or anybody else in my family, so I just, I rather not say too much, cause I know when the paperwork comes out, I'm practically done for."[8]

---

[8] B.F. testified that "paperwork" referred to her statements implicating defendant.

7

B.F. told McGriff that defendant said something like, "calm down or something, its . . . guns in here, or there's a gun in here." Defendant also said, "do you want problems." Jones responded, "shoot if you want to and [I']ll air this whole shit out." At that point, she saw defendant, who was at the entrance of the kitchen, "run towards the back of the house" where Jones was. She was "pretty sure" defendant had a gun in his hand when he ran toward Jones. After hearing a gunshot, she saw Jones running toward the front door. He stumbled or tripped, and a bullet hit him in the back of his head. B.F. heard two more gunshots and saw the impact on Jones's body. She did not think Jones was armed, but she thought, "maybe [defendant] probably got scared, and thought that there was a weapon in the car."

Davinci M.

*Trial Testimony*

The day before the shooting, Davinci was hanging out at the Belmont apartment. He estimated he drank about 10 shots and agreed he was "drunk" and "stoned" by around 10:00 or 11:00 p.m.

That evening, defendant pulled a firearm—a .357 Glock—from his waist and showed it to Davinci. No one mentioned Jones that evening, and Davinci was not aware of any tensions between Jones and anyone in the apartment. Davinci fell asleep by a long couch in the living room at around 2:00 a.m.

When Davinci awoke to banging at the front door, Jolie told everyone not to open the door. Defendant opened the door and said, " 'What the fuck is your problem?' " Jones "barge[d] in with two girls." Jones asked Davinci, " 'How you been?' " as he walked to the bedroom; he sounded friendly and not angry. As soon as Jones's sister walked in the door, she started attacking Jolie.

8

Jones came out of the bedroom with a TV, and defendant tried to take it away from him. Jones and defendant started arguing and defendant said, " 'What the fuck are you all doing? You all know I got guns?' " Jones responded that he had one, too. Jones tried to walk outside to his car, but defendant "d[id]n't let him." Defendant pulled the gun from his waist and pointed it at Jones. Defendant and Jones started "fighting over the gun and a couple of shots got fired." They continued to fight, and defendant tripped Jones near the front door. Jones fell face down, and defendant shot him in the back of the head and then twice in his back.

Davinci was interviewed by McGriff within a few hours of the shooting, and he testified he was honest and truthful with the detective. He agreed his memory of the shooting was much better at the interview than at trial. Davinci recalled telling McGriff that before defendant shot Jones, "everyone was screaming, 'No, don't do it, no.' "

Davinci acknowledged he was given immunity for his trial testimony because he was "less than truthful at [the preliminary] hearing."[9]

In cross-examination, defense counsel questioned Davinci about inconsistencies between his trial testimony and statements he made in his police interview and at the preliminary hearing. Davinci acknowledged that at the preliminary hearing, he testified he never saw anybody get shot.

Defense counsel asked whether Davinci recalled in his police interview that McGriff asked him why defendant was so upset, and he responded,

---

[9] In a pretrial hearing, the prosecutor explained that Davinci's preliminary hearing testimony was inconsistent with his earlier police interview. The prosecutor anticipated Davinci would "testify consistently with his first statement [to the police]. But he will also admit that he lied at the preliminary hearing." Therefore, Davinci was granted use immunity for his trial testimony.

" 'Cuz I guess he's, like, Jolie's other—I think, brother, I guess. Jolie told him, like, about him talking shit at her, threatening her and shit. He was threatening her and tell her like all of this shit, like, like, like, oh, you're a bitch, and I want my shit back.' " Davinci agreed that he was talking about Jones "talking shit" to Jolie.[10]

Davinci admitted he used to be in gangs, and he went to jail for a home invasion.

*Police Interview*

Following Davinci's testimony, the prosecution played his videorecorded interview with McGriff.

Davinci told McGriff that when the banging on the door started, "we're all, like, freaking out, like, 'What the fuck do we do?' " Defendant "got mad," and said, " 'What the fuck y'all doing'?' 'Y—y'all know I have guns,' " and Jones responded, " 'I don't give a fuck. I have guns too.' " Davinci said, "I see him shoot him in the head and then, like, in the side and the back."

Davinci thought "the girls were tryin' to stop" the wrestling. He told McGriff defendant shot Jones because Jones "threatened him saying that, 'I got guns too. Let me see what you got.' " McGriff asked whether defendant said anything. Davinci answered, "Just pointed it at his head and everyone was screaming, like, 'No.' Like, 'Don't do it.' Like, 'No.' "

Although he told McGriff that defendant pointed the gun at Jones, later in the interview, Davinci said, "I just seen them wrestling. I don't even know what—how the gun came out 'cause he didn't have the gun on him. I think he had it in his, like, shorts or something and it just dropped when they were wrestling."

---

[10] That Davinci made this statement was confirmed when his interview was played at trial.

Davinci agreed with McGriff's suggestion that the incident was "more about [defendant] tryin' to stand up for (Jolie) than it [was] just a fight." Davinci thought defendant was upset because "he looks at (Jolie) like a little sister."

McGriff asked, "So it's more about that [defending Jolie] than it is about—you just interrupt me 'cause I was sleepin' and now I'm pissed off." Davinci responded, "I think it's both. . . . I'm not sure. But he looked m— (unintelligible) he just looked really crazy, like he was mad, like, hella mad."

Victor B.

*Trial Testimony*

At the time of trial, Victor was incarcerated in state prison, he was a current member of a criminal street gang, and he had a prior conviction for residential burglary and a juvenile court adjudication for assault with a deadly weapon.

Victor was an uncooperative witness. While he acknowledged he stayed with his sister Jolie in her Belmont apartment in August 2017, he denied knowing Davinci or B.F. Victor admitted he knew Jones, but he would not say whether Jones and Jolie dated.

Victor claimed he remembered "nothing about that day" of the shooting. He agreed the Belmont police showed up, he had a one-hour interview, and he "told them about what had happened at the apartment." However, he also said he was under the influence, "so whatever I said, I wasn't—I was just saying what I had to say." He testified he woke up to a lot of noise and saw "[a] lot of people I do not know." Then "[t]here was gunshots" inside the apartment.

Victor would not identify himself in his recorded police interview. At trial he claimed not to remember telling the police that B.F.'s boyfriend had a

11

gun, that Jones and B.F.'s boyfriend struggled over an object, and that he heard several gunshots. Victor agreed that testifying truthfully could get him killed.

In cross-examination, Victor agreed that a rule of his gang was not to cooperate with law enforcement, and defendant was not part of his gang. He acknowledged that when he spoke to the police on the day of the shooting, he was concerned about being a suspect himself. He denied he ever told an investigator that Jones sold guns or that he was a pimp.

*Police Interview*

After Victor was excused, his interview with McGriff on the day of the shooting was played for the jury.

Victor told McGriff that the previous day, Jones called him and said he heard that Jolie had "moved on with a girl" and that she was " 'talking shit about' " him. Victor knew that Jones was texting Jolie and was "very mad that [she] was moving on with . . . a girl." Jones would call Jolie and say things like, " 'Yeah, bitch I'm goin' to beat your ass, yeah.' " But Jones told Victor when he asked Jolie for his things, he was " 'just playin' around' " and he " 'd[id]n't even want that shit back.' "

Victor thought it was Jolie who opened the door slightly, and then Jones "just pushed open the door," and his cousin and sister "all stormed in after." Jones said he just came to get his stuff, and Victor thought "everything [wa]s cool." But then defendant and Jones started talking and arguing.[11]

---

[11] Victor referred to the shooter as B.F.'s boyfriend and said he did not know his name. At the end of his police interview, Victor chose defendant's photo from a photographic lineup.

12

Victor said that defendant said, " 'I got hammer,' " which meant he had a gun.  Jones responded with something like, " 'Well, I got hammer too.' " Someone was physically holding defendant back, and Victor thought it was B.F.  Defendant "rushed" past B.F., and he and Jones "started . . . fightin' with the . . . gun."  Victor told McGriff he never saw defendant "point the gun but I remember hearing [Jones] like, 'What, n***a, you tryin' to point the gun at me.' "  They were "tussling for the gun" and "shooting on the floor." Defendant had the gun in his hand when he left the apartment.

McGriff asked why defendant was so mad.  Victor said, "It was like the spur of the moment.  [Jones] came through.  He barged right in. . . ."

*Subsequent Police Interview*

After Victor's interview from the day of the shooting was played, defense counsel asked McGriff about statements Victor made in a second interview conducted in February 2018.[12]  Victor said that Jones wanted Jolie to " 'ho up' " and she did not want to.  (McGriff opined that "ho up" referred to prostitution.)  Victor said Jones sold " 'guns and hit licks.' "[13]

The prosecutor asked additional questions about the February 2018 interview.  McGriff testified that Victor said Jones had nothing in his hands when he was shot, and there was only one gun in the apartment that day. Victor said Jones was running toward the door when he was shot, and defendant stood over Jones and shot him three more times.  The prosecutor asked whether Victor described the look on defendant's face during this time. McGriff responded, "He said his eyes were real big and that he had angry

---

[12] This interview was not played for the jury.  Victor's statements were introduced through McGriff's testimony only.

[13] A subsequent witness explained "hit licks" means "to rob people."

13

eyes, and he looked like a demon." McGriff testified Victor used the word "demon" more than once and said defendant was a "devil person."

In further cross-examination, defense counsel asked McGriff about Victor "indicating that Mr. Jones and [defendant] were exchanging fighting words, from fighting words to gunshot words, when, in effect, [Victor] heard [Jones] say that he had a gun in the car; correct?" Referring to the interview transcript, McGriff responded, "It says, 'I got unintelligible in the car.'" McGriff confirmed that the next thing Victor said was: "'[Jones] should have never said that. I am about to say if he never said that, the situation would have been totally different, fellas. Because you can't threaten somebody and not knowing what that person got on him. See, nobody knew [he] had what he had on him. So when you, unintelligible, him 'cuz the whole point was [Jones] came and bumped in the door, bumped into [him], started exchanging words.'"

Defense counsel established through cross-examination that Victor also said: "'Hasn't seen [Jones] with no weapon. But when [Jones] came through, quote, "He came through the house. He came through rockin'." He came through very—like, how all the times he's been threatening. Because he told me himself, this is what I used to trip out at because it's like, Brody, why in the hell is this? Why? Why? This is what I used to trip out at. It's like, Bro, why?'" And, "'. . . he kept saying, "Hey, I am going to kick down the door. I am going to kick the door down. I am going to kick the door down." You—but—but he's threatening me, letting me know that you got shooters and gunners fixin' to come, bum-rush, kick down my sister's door. For what?'"

McGriff's next question after Victor mentioned "shooters and gunners" was whether defendant knew anything about these threats. Victor answered, "No, no, no."

14

Kendra S.

Kendra knew Jolie through Jolie's new girlfriend. She arrived at the apartment late on August 4, and she later slept on the bedroom floor.

Kendra awoke to loud banging and was still lying on the floor when a man came into the bedroom, grabbed a TV, and left. Kendra testified she felt confused but did not have any concerns or worries at this point. She heard a loud commotion involving female voices and another commotion involving male voices. Then she heard shuffling of feet that sounded like wrestling and gunshots. She and Jolie's girlfriend hid in the bedroom closet, and they remained in the bedroom until the police arrived.

Monique M.

The night before the shooting, Monique was hanging out with her cousins Jones and Venisha at Jones's home in Union City, drinking and smoking marijuana. At some point, they decided to go to Belmont so Jones could pick up some things. Venisha drove them in her car. Monique was friendly with Jolie and considered her a cousin.

When they arrived at the Belmont apartment, Monique and Jones got out of the car, and she knocked on Jolie's living room window. Someone opened the front door. Defendant "said he had a gun," and Jones "said he don't give a fuck about that." Jones walked toward the back of the apartment. Monique followed Jones into the apartment and asked Jolie for socks because her feet were cold. Jolie got her some socks.

Monique recalled standing next to defendant near the kitchen and defendant "telling someone to pass him the gun." A man handed a gun to defendant, but she did not remember what he looked like. Monique did not think she was scared when she first saw defendant with a gun because she said to him, " 'We didn't come here for this,' " meaning they did not come for

15

"arguing or fighting or anything like that." Neither Monique, Jones, nor Venisha had any weapons.

Jones came down the hallway with a TV. Defendant walked toward Jones. Monique heard defendant and Jones arguing in the hallway. She heard a gunshot and ran to the refrigerator with Jolie. After the gunshot, she just remembered she and Jolie were screaming in the kitchen and then everyone ran out of the house.

In cross-examination, Monique confirmed she, Venisha, and Jones had stayed up all night drinking alcohol and smoking marijuana before going to the Belmont apartment. She testified she did not know Jones and Jolie had broken up and denied hearing anything about Jones being upset because Jolie was dating a woman. She did not think it was odd or inappropriate that they were going to Jolie's house at 5:00 a.m.

Venisha

Venisha testified that in August 2017, Jones and Jolie had been dating for about a year, and Jones was living "back and forth between Jolie's house and [his] mom's house." Venisha thought their relationship was fine and only heard Jolie was dating a woman after her brother died.

When they pulled into the driveway of the apartment complex, Venisha turned her car around and pulled up to Jolie's front door with the car facing the street. At that point, the front door was open, and Venisha ran in and went straight to the bathroom, telling everyone she had "to pee real bad." From the bathroom, she heard Jones arguing with someone and then saw Jones "coming down the hallway, fighting someone." She did not know who Jones was fighting and did not see any weapons.

Venisha testified Jones and the man he was fighting were near the front door when the man said, " 'Hand me my gun.' " Then shots were fired,

16

and Jones hit the ground. She "went to help [her] brother fight the dude," and then she "kind of just blacked out after that" and started "fighting everybody that [she] could see."

Venisha testified, "They were just fighting. And then I think my brother was getting the best of him, and that's when he asked for a gun."

In cross-examination, defense counsel questioned Venisha about statements she made to the police within a couple hours of the shooting. Venisha remembered telling McGriff she saw " 'this little dude with a gun' " while she was in the bathroom. She remembered saying, "After I came out of the bathroom, I don't know what happened. I just seen him in the hallway. And see him with a gun, dude with a gun. And I help my brother. I seen my brother grab his arm, and I grabbed his arm. And then I heard pow, pow, pow, pow.' "

Venisha denied that she said, " 'I am going to break some shit up,' " and denied that Jones said, " 'We're going to spray this place up.' "

Defendant's Police Interview

Defendant was apprehended and interviewed by the police on August 9, 2017, and the videorecorded interview was played for the jury.

In the interview, defendant told McGriff he was in Oakland on August 4 and 5 and claimed he had never been to Belmont. He said he did not know Jolie, although he knew B.F. Defendant insisted he was not in Belmont but said he "heard about the situation" and knew what McGriff was talking about. He said Jones's "family was the reason behind him dyin," they "egged him on," and "how else would he get to that area?"

McGriff asked whether Jones said something "that scared you," and defendant responded, "He—I don't—that dude too young to scare me, like, I mean, he wouldn't scare me. Know what I'm saying? I know who he is."

Defendant said, "I know if I go on somebody property and I'm not supposed to be there[,] they got the right to shoot me. And most people will shoot me." He said what happened was Jones "went to somebody house trippin', man. Like what's gonna happen? That's what's gonna happen when you go to somebody else house trippin' and you're not wanted."

Expert Testimony on Snitching and Jail Calls

San Mateo County Sheriff's Deputy Audyama Williams testified as an expert on "the no snitch subculture and slang terminology." Williams testified that in the "no snitching subculture," cooperating with law enforcement may result in ostracism from the community or violence inflicted upon those who cooperate with police or upon their loved ones. "Paperwork" in the context of snitching means being "documented as participating in an investigation."

Jail calls between defendant and B.F. from August 14 to 28, 2017, were played for the jury. Williams listened to the recorded jail calls, and the prosecution asked him to explain some of the words and phrases used in those calls. While the jail calls were primarily offered to support the charge of dissuasion of a witness (B.F.) by force or threat, defendant also discussed the shooting in these calls.

In one call, defendant said to B.F., apparently referring to how Jones's killing could have been avoided, "A n***a not gonna act like he's with the shit coming my way. That would have prevented it." According to Williams, this meant, "if this guy is not going to act like he's tougher than he is and coming my way, coming at me, disrespecting me, that could have prevented it." Defendant said, "Ain't . . . nobody about to run up on me," which meant "nobody is going to challenge me." Defendant continued, "I ain't gonna feel

sorry for nothing that ain't my fault.  You came lookin' for problems and that's what you got."

In another call, defendant said, "the reason why your son got whacked, 'cause . . . he was acting like he was hard . . . .  I don't give a fuck . . . ." Williams explained that "act[ing] hard" means pretending to be tough and "whacked" means killed.  In the same call, defendant said, "anybody coming in that courtroom well best believe they getting whacked too."

Additional Evidence

In the Belmont apartment, police found blood on the inside of the front door, blood spatter in several places on the hallway wall, and blood stains on a wall between the hallway and the bathroom, on the bathroom door and door frame, and on the door of the hallway closet between the bathroom and the bedroom.  There were bullet holes on the bedroom door and a wall of the bedroom, and a bullet was recovered behind the wall.  No firearms were found in either Venisha's car or the Belmont apartment, and the firearm used in the shooting was never located.

The forensic pathologist who autopsied Jones's body found he had sustained four gunshot wounds.  There was a through-and-through gunshot wound to the arm with discoloration around the entrance wound that "could possibly be powder burns," indicating the gun was fired at close range.  There was an entrance wound at the top of the head with no powder burning.  The bullet that caused this wound traveled down the body and was recovered in the left lung area.  There were two entrance wounds in the lower back very close to each other.  The pathologist concluded the cause of death was "the totality of all four gunshot wounds put together."  He could not say the order in which the wounds were inflicted, but the gunshot wound to the head would

19

have been instantly incapacitating.  Jones was 69 inches long and weighed 243 pounds.

A forensic toxicologist conducted a routine drug screen of Jones's blood sample and found a blood alcohol content of .17, which "would be considered a moderate to large amount of alcohol."  He also found cocaine at a level of .06 milligram per liter, which is "the low end" of the effective range at which a person might feel some effects.  The toxicologist testified that persons with this amount of alcohol and cocaine in their system would tend to have lower inhibitions, be more talkative and active, and have problems with balance, and their decision processes and speech would be slower.  He agreed they also might be aggressive and talk loudly.

*Defense*

The defense did not call any witnesses.  In her opening statement, defense counsel described Jones and his relatives arriving at Jolie's "all liquored up" "and basically engag[ing] in something akin to a home invasion." She asked the jury "to keep in mind what happens when you're sleeping, dead asleep, in what feels like the middle of the night, and all hell breaks loose from people you don't know."

In her closing argument, defense counsel suggested defendant was afraid of Jones who was "somewhere between 60 and 100 pounds heavier than [him]."  She emphasized the issues between Jones and Jolie, stating Jones "wanted to pimp out" Jolie "and she resisted," and Jones sent her "threatening texts," which "were sufficiently alarming" that Jolie put his things outside for him to pick up while she waited inside with a baseball bat. Defense counsel pointed to Venisha's testimony that defendant asked for his gun "because [Jones] so clearly had overpowered [defendant] in the physical fight."  She argued the forensic evidence was consistent with Jones being shot

20

in the head as he "charged forward toward the car outside" and suggested defendant was afraid Jones was going to the car to get a gun. She told the jury that defendant "was caught up in this tragic and stupid situation, which was entirely of Dejohn Jones's making." She concluded, "If people come into your home and you are the homeowner, you've got the Stand Your ground law. But if people come into your home, or a home you happen to be staying, and they're terrorizing you and terrorizing everybody in the house and creating th[is] kind of circumstances, it's not a first degree murder. It's not second degree murder. It's manslaughter."

## DISCUSSION

### A.    *Admission of Davinci's Police Interview*

Defendant contends he was denied due process and a fair trial when the trial court admitted Davinci's statements to the police. As part of this claim, he also argues the prosecutor committed misconduct. These arguments are forfeited, and we find no prosecutorial misconduct.

### 1.  Procedural Background

In the People's trial brief, the prosecutor explained he "anticipate[d] multiple witnesses will be uncooperative and/or provide inconsistent statements" at trial. Many of the People's motions in limine related to this concern; the prosecutor sought (1) to admit prior inconsistent statements of witnesses both as impeachment and for their substance, (2) to permit the prosecutor to lead his own witnesses if they were "obviously evasive [or] uncooperative," and (3) to present Williams as an expert on "the subculture of non-cooperation among witnesses and victims," so the jury would "understand the motivation underlying the testimony and behavior of those witness[es]."

21

As to Davinci, however, the prosecutor anticipated he would "testify consistently with the detailed statement he gave to the police in the hours after the homicide," but it was also expected that he would "be impeached with his prior inconsistent testimony from the preliminary hearing." Given this expectation, the prosecutor moved to admit Davinci's "initial detailed statement [to] the police as a prior consistent statement" under Evidence Code sections 1236 and 791.[14]

At a hearing on the motions in limine, defense counsel argued the police interview could be admitted to rehabilitate Davinci's credibility only "if, in fact I attempt to impeach him with the inconsistencies at preliminary hearing." The prosecutor responded that defense counsel was "absolutely right," Davinci "has to be impeached with his prior inconsistent statement first *by opposing counsel*." (Italics added.) The trial court then ruled in agreement with parties that the police interview could be admitted if defense counsel impeached Davinci with his inconsistent preliminary hearing testimony.

---

[14] Evidence Code section 1236 provides, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791 provides, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

When Davinci testified at trial, defense counsel did impeach him with his preliminary hearing testimony, confronting him with his prior testimony that he was hiding behind a couch and did not see anybody get shot. Following Davinci's trial testimony, the prosecutor called McGriff to establish he interviewed Davinci on the day of the shooting and the interview was videotaped, and then the prosecutor asked to play the video of the interview. Defense counsel raised no objection.

2. Defendant's Appellate Claims Are Forfeited

" ' "[N]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881, quoting *United States v. Olano* (1993) 507 U.S. 725, 731.)

" 'A verdict may not be set aside on the basis of the erroneous admission of evidence . . . unless the party asserting error has preserved the question by a *timely and specific objection* to the admission of the evidence, or by a motion to strike or exclude the evidence.' [Citation.] '[T]he objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' " (*People v. Hayes* (1999) 21 Cal.4th 1211, 1261, italics added.)

On appeal, defendant argues (1) the trial court erred in allowing the prosecutor to read into the record various statements Davinci made to the police on direct examination and in admitting the recorded interview as prior consistent statements, (2) it was error to admit the *entire* interview even if certain portions were admissible as prior consistent statements, and (3) the

23

prosecutor committed misconduct by misrepresenting how he intended to question Davinci. These arguments are all forfeited because defense counsel failed to raise them with the trial court.

At the pretrial hearing, defense counsel did not dispute the prosecutor's premise that the police interview could be admitted as a prior consistent statement so long as defense counsel first impeached Davinci with inconsistencies from the preliminary hearing. At trial, when the prosecutor questioned Davinci about individual statements Davinci made to McGriff the day of the shooting, defense counsel did not object that those statements were inadmissible hearsay.[15] When the prosecutor asked to play Davinci's police interview, defense counsel did not object that only portions of the interview were admissible as prior consistent statements. Defense counsel never argued the police interview should be redacted to delete specific statements made by Davinci that were not admissible either as prior consistent or inconsistent statements. Nor did defense counsel object to the admission of the police interview on the ground the prosecutor misled the court about how he was going to question Davinci. In short, defendant failed to preserve his appellate claims because defense counsel never made specific objections on the grounds now raised on appeal.

In his reply brief, defendant urges that the issues are not forfeited because defense counsel "objected numerous times." He cites various pages to

---

[15] When the prosecutor asked, "Do you recall [defendant] saying, 'What the fuck are you all doing? You all know I got guns'?" defense counsel did object to the question as leading. But defense counsel did *not* object on the ground the question impermissibly introduced inadmissible hearsay evidence. (The objection was not sustained, and we note that "[l]eading questions are permitted on direct examination 'to the extent necessary to stimulate or revive [the witness's] recollection.'" (*People v. Collins* (2010) 49 Cal.4th 175, 215.))

24

the reporter's transcript and quotes various statements by defense counsel, but these citations and quotes do not show defense counsel raised any of the issues now raised. Certainly, defense counsel objected to the prosecutor discussing Davinci's grant of immunity; she argued at a pretrial hearing, "he's only getting use immunity for perjuring himself at the prelim. If I don't seek to impeach him with that perjury, then there is absolutely no basis for the jury being made aware that he's testifying under any immunity whatsoever. I mean, it's tantamount to bringing in the statement without having a legal basis to bring in the statement."[16] But defense counsel's arguments at the hearing in no way alerted the trial court or the prosecutor to the different issues defendant now raises on appeal.

The Attorney General spends many pages of the respondent's brief explaining why some of Davinci's statements in the police interview were admissible as prior consistent statements under Evidence Code section 1236, other statements were admissible as past recollection recorded under section 1237, and the interview as a whole was admissible as a prior inconsistent statement under section 1235 because it "was inconsistent in effect with his claimed intoxication and consequent impaired perception and memory."

While the Attorney General's arguments appear to have merit, it is not the appellate court's role to explain to the defendant on appeal why evidentiary objections he did not make with the trial court are unavailing.

---

[16] The prosecutor responded that defense counsel was conflating two issues, that is (1) the admissibility of the police interview as a prior consistent statement and (2) introducing the fact that Davinci was testifying under a grant of immunity because his trial testimony was inconsistent with his preliminary hearing testimony. The prosecutor again *agreed* with defense counsel that the police interview would only be admitted as a prior consistent statement if defense counsel "first impeach[es] my witness." And that is what happened at trial.

An appellant "cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 438, fn. 5.) To the contrary, appellate review "is in fact *barred* when the issue involves the admission (Evid. Code, § 353) . . . of evidence."[17] (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6, italics added.) Defendant's arguments fail at the outset because they are forfeited. Defendant's due process claim, which is based on the same claimed evidentiary error is also forfeited. (See *In re Sheena K.*, *supra*, 40 Cal.4th at pp. 880–881 [forfeiture rule applies to constitutional claims].)

3. <u>Defendant Has Not Shown Prosecutorial Misconduct</u>

Defendant argues the prosecutor engaged in misconduct first by misrepresenting what he intended to do when he called Davinci to testify and second by improperly "vouching" for his credibility.

Defendant concedes the first argument is forfeited because no objection was made at trial. It is also meritless. In the hearing on motions in limine, the prosecutor stated that if Davinci testified at trial as anticipated, then the prosecutor would introduce "the fact that he testified differently at the preliminary hearing and that now he's under a grant of immunity." That is what the prosecutor did at trial. There was no misrepresentation.

---

[17] Evidence Code section 353 provides, "A verdict or finding *shall not be set aside*, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence *unless*: [¶] (a) There appears of record *an objection* to or a motion to exclude or to strike the evidence that *was timely made and so stated as to make clear the specific ground of the objection or motion*; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Italics added.)

Nor did the prosecutor improperly vouch for Davinci by letting the jury know he was testifying under a grant of immunity. (See *People v. Frye* (1998) 18 Cal.4th 894, 971 [rejecting claim of improper vouching where the prosecutor "in accordance with the obligation to disclose to the jury any inducements made to a prosecution witness to testify" read the terms of witness's immunity agreement], disapproved of on another point by *People v. Doolin* (2009) 45 Cal.4th 390; cf. *People v. Price* (2017) 8 Cal.App.5th 409, 464 ["it is not misconduct for the prosecutor to address the obvious credibility issue that will necessarily arise when an accomplice or similarly involved witness testifies in exchange for a plea agreement by eliciting the term of the agreement requiring the witness to testify to the truth rather than in favor of one side or the other"].)

Defendant has not shown prosecutorial misconduct.

B.  *Defense Counsel's Failure to Object to Admission of Portions of B.F.'s Police Interview*

Defendant next argues that not all of B.F.'s statements made in her police interview were admissible as prior inconsistent statements and that McGriff's questions should have been redacted under Evidence Code sections 352 and 1101, subdivision (a).[18] Defendant concedes defense counsel did not raise these issues with the trial court. The arguments are therefore forfeited.

---

[18] Evidence Code section 352 permits the trial court in its discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence Code section 1101, subdivision (a), generally prohibits admission of "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion."

Recognizing these evidentiary claims were not preserved, defendant contends defense counsel provided ineffective assistance of counsel in failing to object on the grounds he now raises.

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [habeas corpus is the more appropriate procedure to address an ineffective assistance of counsel claim because it may include evidence of an attorney's reasons for making the complained-of decision, which is outside the appellate record].)

Here, defense counsel was not asked why she did not object to the admission of portions of B.F.'s police interview on the grounds now raised.

Defendant claims there could be no conceivable reason for not objecting to certain questions posed by McGriff, which defendant characterizes as "manifestly inadmissible, highly prejudicial evidence." Defendant objects on appeal to questions in which McGriff refers to defendant as a "bad dude" and talks about the shooting as in "cold blood."[19]

---

[19] For example, McGriff asked B.F. whether she had any contact with defendant since the shooting because defendant had not yet been

28

The Attorney General responds that defense counsel could have determined that objections to McGriff's statements would be fruitless because, among other things, the statements were admitted for context to show how the detective "secured [B.F.]'s cooperation in the investigation—not for the truth of the matter asserted or as character evidence." We agree that McGriff's statements were not offered to prove defendant was a "bad dude." We also think defense counsel reasonably could have determined that redaction was not necessary because there was no risk the jury would understand McGriff's statements to be evidence of defendant's character.[20]

Defendant also asserts, "Even assuming some of [B.F.]'s statements impeached her trial testimony, defense counsel should have moved to redact the interview to include only the prior statements she made which actually impeached her testimony." Defendant does not, however, attempt to show

---

apprehended. Apparently emphasizing the urgency of finding him, McGriff said, "Right, this is a *really bad dude, who, uh, killed somebody in cold blood*, right, um, I need to find him." (Italics added.) McGriff asked, "So, Ok, how, how are you gonna get me some information so I can get this *really, really bad dude* off the street, I need, I need to know where this dude is, . . . so I can get this guy off the street." (Italics added.) Later, McGriff said, "Know what I mean, *he has the capability to shoot somebody in cold blood, over a little argument*, you know, I need to know how to get ahold of him." (Italics added.)

[20] The Attorney General further points out that McGriff often asked whether the shooting was "cold-blooded murder" in his interview with defendant, which occurred two days after his interview with B.F. McGriff asked defendant, "So did it happen 'cause it was a cold-blooded murder or did it happen because you guys got into a fight?" and "Which one are we investigating, a cold-blooded murder or an accidental shooting?" Thus, the jury would have realized McGriff's frequent use of the term "cold-blooded" was merely part of his investigative interviewing technique, not evidence suggesting defendant committed cold-blooded murder.

there could be no reasonable explanation for not seeking such redaction. Under these circumstances, defendant cannot prevail on direct appeal.

Moreover, in her closing argument, defense counsel relied on statements B.F. made in her police interview, telling the jury, "As [B.F.] . . . said in her statement to [Detective] McGriff on August 7th, '[Defendant] probably got scared that there was a gun in the car.'" This was the *only* mention by any witness made at any time that defendant may have been "scared" of Jones around the time of the shooting, and it was crucial to the defense theories of provocation and imperfect self-defense.[21] Had defense counsel sought to redact B.F.'s police interview to delete all statements that were not inconsistent with her trial testimony, the prosecutor undoubtedly would have succeeded in having this statement deleted, too, either because it was not inconsistent with her testimony or because it was speculation.[22] Accordingly, we cannot say there could be no satisfactory explanation for defense counsel's omission, and any claim of ineffective assistance based on this omission must be resolved in a habeas corpus proceeding, not on direct appeal. (See *People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

---

[21] Kendra testified she was scared when she heard a gunshot, B.F. testified she was afraid for her safety after the shooting started, and Davinci said people did not try to intervene because they were scared. But when asked what scared them, Davinci responded "getting shot" by "*the defendant.*" (Italics added.) No witness testified that anyone was afraid of *Jones* that morning.

[22] We note that defense counsel was otherwise unable to get in evidence suggesting defendant feared Jones was leaving the apartment to get a gun in his sister's car. In cross-examination of Davinci, defense counsel asked him what he thought Jones "was going out [to his sister's car] to get." But the court sustained the prosecutor's objection that the question called for speculation.

Finally, in the section of his opening brief related to admission of B.F.'s police interview, defendant asserts, without explanation, "For the same reasons, counsel also should have objected on these grounds to the admission of [Davinci]'s statement." This bare assertion violates California Rule of Court, rule 8.204(a)(1)(B), which requires each point to be raised under a separate heading or subheading and to be supported by argument. The claim is forfeited because defendant's brief does "not provide legal argument and citation to authority on [the] point raised." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364.) We further note that—as with B.F.'s police interview—defense counsel relied on statements Davinci made in his police interview in her closing argument.[23] She also pointed to inconsistencies between Davinci's trial testimony and his police interview and argued, "It's just kind of indicia, perhaps, of some of his either cognitive or credibility issues or something that is going on with him." Perhaps, defense counsel determined that, on balance, Davinci's recorded police interview as a whole harmed his credibility more than helped. On the record before us, we cannot say that no reasonable attorney could reach such a determination.

---

[23] For example, defense counsel quoted Davinci's statement that " 'we were all freaking out, like, what the fuck do we do?' " This was useful to the defense as no witness at trial described everyone as "freaking out" over the banging on the doors. But this statement was not clearly consistent or inconsistent with Davinci's trial testimony and likely would have been deleted had defense counsel sought redaction. Defense counsel also referred to Davinci's statement to police that defendant looked crazy and mad (which he did not say at trial). Defense counsel may have believed this evidence tended to support the defense theory of provocation and undercut the prosecution theory that defendant acted with premeditation and deliberation.

C.    *Defense Counsel's Failure to Object to Admission of Portions of Victor's Police Interview*

Defendant argues the trial court erroneously admitted Victor's entire police interview, and defense counsel was ineffective in failing to object on all grounds he now raises. Defendant has forfeited his claim of trial court error.

As to his ineffective assistance claim, there is a satisfactory explanation for defense counsel's decision not to object on the grounds raised on appeal. Defendant now claims the prosecutor did not sufficiently lay foundation for each statement Victor made in his police interview because the prosecutor did not go line by line asking Victor on the stand whether he remembered either the fact stated or that he made the statement to the police. But had defense counsel timely objected on this basis, the prosecutor could have cured the claimed error by recalling Victor and asking him about every detail he provided in his police interview. Defense counsel reasonably could have determined that no defense purpose would be served by raising an objection that would only lead to the prosecutor questioning Victor in such detail. In addition, defense counsel may have determined that Victor's police interview was more helpful than harmful to the defense, as Victor described Jones being upset about Jolie dating a woman and harassing and threatening Jolie the day before the shooting.

Defendant also argues defense counsel should have sought to redact McGriff's "gratuitous statements." Again, we conclude defense counsel reasonably could have determined that no redaction was necessary because the jury would understand McGriff was just trying to get information from a witness hours after a shooting.

D.    *Jury Instructions on Provocation*

The trial court gave the jury CALCRIM instructions on provocation: effect on murder (CALCRIM No. 522), voluntary manslaughter: heat of

passion (CALCRIM No. 570), and voluntary manslaughter: imperfect self-defense or imperfect defense of another (CALCRIM No. 571). In addition, the court instructed the jury with the following pinpoint instruction requested by the prosecutor: "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or be conduct reasonably believed by the defendant to have engaged [*sic*] in by the victim. If the defendant causes the victim to commit an act which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked. In such case, he is deemed to have acted with malice and would be guilty of murder."

Defendant does not claim this is an incorrect statement of the law. But he argues the instruction should not have been given because it was argumentative, duplicative, and incomplete. We disagree.

An instruction is argumentative when it is " 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) The instruction at issue is not argumentative as it does not invite the jury to draw inferences favorable to the prosecution nor does it refer to specified items of evidence.

Defendant argues the instruction was duplicative of CALCRIM No. 570, which told the jury, "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up . . . his . . . own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient." But nothing in CALCRIM No. 570 (or CALCRIM No. 522 on provocation's effect on murder) informed the jury that the provocation "must be caused *by the victim* ([citation]), or be conduct reasonably believed by the defendant to have been engaged in by the victim."

33

(*People v. Lee* (1999) 20 Cal.4th 47, 59, italics added.) This statement of law was relevant because defense counsel at times relied on the behavior of Jones's relatives as creating the situation that provoked defendant to kill Jones.[24] Similarly, nothing in the CALCRIM instructions explained to the jury that "a person who provokes a fight [cannot] be heard to assert provocation by the victim, such that a reasonable person in his position would lose judgment and kill." (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312.) Instruction on this point was warranted given the evidence that defendant was the first person to mention a gun, that defendant ran toward Jones and pointed a gun at him, and that defendant and Jones wrestled over defendant's gun.

Defendant does not elaborate on his assertion that the pinpoint instruction was incomplete. " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) The jury was instructed that it was the People's burden to prove murder beyond a reasonable doubt, and provocation was to be considered if the jury concluded defendant committed murder. The

---

[24] In her opening statement, defense counsel told the jury there was evidence Monique and Venisha entered the apartment and "immediately physically attacked Jolie . . ., punching her, pulling her hair." She argued, "It was a situation that was emotionally and physically very hot, a lot of provocation. *These people* have invaded this apartment at 5:00 in the morning." (Italics added.) Later, in a discussion about jury instructions, defense counsel argued instructions on voluntary manslaughter were warranted because "*people* barge in . . . yelling and screaming, removing property, kicking dog bowls, kicking things over, breaking things . . . ." (Italics added.) But the only person described as kicking anything over or threatening to break things was Venisha, not Jones.

pinpoint instruction would not mislead the jury about the prosecution's burden of proof.

E.    *Failure to Object to the Prosecutor's Conduct*

Defendant argues the prosecutor engaged in numerous instances of misconduct, and defense counsel was ineffective in failing to object. This argument is unavailing.

Defendant claims that in pretrial discussion on motions in limine, the prosecutor misrepresented the evidence on what defendant knew about Jones threatening Jolie in the days before the shooting. The prosecutor argued evidence of Jones's threatening texts should be excluded because there was no evidence defendant knew about them. We have read the prosecutor's arguments, and we see no misrepresentation of the evidence. Moreover, the evidence of Jones's threats to Jolie did come in at trial, so there is no prejudice.[25]

Defendant next claims it was misconduct for the prosecutor to elicit testimony from McGriff about Victor's description of defendant's demeanor when he shot Jones. He argues the statement was hearsay. But it is not misconduct to introduce evidence that has been ruled admissible (*People v. Foster* (2010) 50 Cal.4th 1301, 1350), and here, the trial court ruled (without objection) that Victor's prior statements to the police were admissible as prior inconsistent statements. Defendant also argues Victor's statement was inadmissible lay opinion. But a percipient witness speaking "from personal

---

[25] In his opening brief defendant asserted the prosecutor engaged in misconduct in his reading of Jolie's preliminary hearing transcript because he omitted portions of her testimony. The Attorney General explained in his respondent's brief that the omitted testimony had been stricken by the court at the preliminary hearing. We assume defendant has conceded the point as he did not mention it in his reply. In any event, it has no merit.

observation" is "competent to testify" about a "defendant's behavior and demeanor." (*People v. Chatman* (2006) 38 Cal.4th 344, 397.)

Next, defendant argues the prosecutor misstated the law in his closing argument in three ways. First, he argues it was misconduct when the prosecutor stated more than once that Jones "had more of a right to be there" than defendant. This was based on Jolie's testimony that she viewed the Belmont apartment as "our apartment," meaning hers and Jones's. (Venisha also testified Jones and Jolie lived together.) Even if we assume for the sake of argument that this was a misstatement of law, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Here, defense counsel addressed the argument in her closing argument, and the prosecutor did not mention Jones's right to be at the apartment in his rebuttal.[26] We cannot say it was ineffective assistance for defense counsel to choose not to object and instead to respond in her own closing argument.

Second, defendant claims the prosecutor engaged in misconduct when he told the jury, "But what is true is imperfect self-defense does not apply when the defendant created the circumstances. The defendant developed the series of events leading up to the victim's shooting. The defendant engaged the victim. The defendant ran up to him. The defendant brought a loaded firearm to a fist fight." This appears to be proper argument based on the evidence and law. (See *People v. Enraca* (2012) 53 Cal.4th 735, 761 [imperfect self-defense " 'may not be invoked by a defendant who, through his

---

[26] Defense counsel told the jury, "Last time I checked, I'm not aware that somebody who is not on a lease, that you have broken up your relationship with some weeks before, who is threatening you, has more of a right to be in your house than an overnight guest. It's ludicrous."

own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack . . . is legally justified' "].)  In any event, we cannot say defense counsel was ineffective for not objecting to the argument.

Third, defendant claims it was a misstatement of the law for the prosecutor to argue there was no evidence that Jones's harassment of Jolie was the reason defendant killed Jones.  The prosecutor argued, "Defense spent a lot of time during closing arguments talking about what the victim had done in relation to [B.F.[27]], the threats he had made, the fact that he was running guns.  [¶] What I want you to ask yourself as you deliberate is what does that have to do with the defendant pulling the trigger on the victim in those moments when he decided to kill him?  [¶] Did the defendant know any of that?  And, if he did, what difference does it make, other than making the victim look bad.  Other than making the victim look less sympathetic, what do those activities, outside of what happened in that apartment, have any bearing on the issues that you're going to have to confront?  What the defendant knew, why he did it.  They don't.  [¶] There isn't any evidence that the defendant was aware of these threats.  And even if he was aware, there's no justification for discounting murder, which is basically what the defense wants you to do."  We see no misconduct.

Last, defendant argues the prosecutor engaged in misconduct when he told the jury there was no evidence that defendant knew about Jones's threats to Jolie and when he argued, referring to defendant's police interview, " "Not once did he use the word 'threatened, self-defense.' . . . [¶] So why would you now, after having presented some defense of manslaughter, why

---

[27] Here, the prosecutor misspoke.  He referred to Jones threatening B.F., but he clearly meant that Jones had threatened Jolie.

would you believe him? There's zero evidence that he believed deadly force was necessary. No one was fearful of the victim in that apartment at that time, including defendant." "[T]he prosecution 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 204.) The prosecutor's arguments were not misconduct.[28]

F.      *Failure to Object to Fines and Fees*

At sentencing in June 2020, the trial court imposed a $300 restitution fine, $120 in court security fees, and $90 in criminal conviction assessments.

Defendant argues defense counsel should have objected to the fine and fees based on inability to pay, and her failure to object constitutes ineffective assistance. But she was not asked for a reason for this omission. For all we know, defense counsel knew defendant did have the ability to pay. On this record, we cannot say defense counsel was ineffective, and defendant's claim must be raised in a habeas proceeding. (See *People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

G.      *Corrections to the Abstract of Judgment and Sentence*

1. Correction to the Abstract of Judgment

The abstract of judgment shows a court security fee of $40, a criminal conviction assessment of $30, and under "Other orders," "Total Fine/Fees $470—Including 10% PC 1202.4(B) Admin Fee—To be Collected by CDCR." Defendant points out the court did not impose $470 in fees or fines or order a 10 percent collection fee, and he asks that these fees under "Other orders" be

---

[28] Finally, defendant claims cumulative error. Because we conclude defendant's evidentiary claims are forfeited, his claims of prosecutorial misconduct lack merit, and his claims of ineffective assistance of counsel fail on direct appeal, his claim of cumulative error necessarily fails.

deleted.  The Attorney General agrees the abstract of judgment does not reflect the trial court's oral pronouncement.  The abstract of judgment must be corrected to reflect court security fees of $120, criminal conviction assessments of $90, and no other orders.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [courts may correct clerical errors at any time].)

    2.  <u>Correction to the Sentence</u>

Finally, the Attorney General notes the abstract of judgment shows a parole revocation fine of $300, but the trial court did not impose that fine at sentencing.  The trial court's oral pronouncement controls (*People v. Mitchell*, *supra*, 26 Cal.4th at p. 185), but the court's failure to impose the parole revocation fine was error.  "Under section 1202.45, a trial court has *no* choice and *must* impose a parole revocation fine equal to the restitution fine." (*People v. Smith* (2001) 24 Cal.4th 849, 853.)  We may correct this error despite the People's failure to raise the issue at sentencing.  (*Id*. at p. 852.)  Accordingly, the sentence is corrected to include a $300 parole revocation fine.

## DISPOSITION

The sentence is corrected to include a parole revocation fine of $300. The trial court is ordered to correct the abstract of judgment to reflect court security fees of $120 and criminal conviction assessments of $90 and to delete "Total Fine/Fees $470—Including 10% PC 1202.4(B) Admin Fee—To be Collected by CDCR."  The judgment is otherwise affirmed.

_____

Miller, J.

WE CONCUR:

_____

Stewart, P.J.

_____

Richman, J.

A160687, *People v. Stewart*